The next case on the call of the docket is agenda number 12, case number 126086, 126087, 126088, Ruben D. Walker, et al. versus Andrea Lynn Chasteen and Exerel Kwame Raul, they're intervener plaintiffs and an appellee. I understand that you're going to be dividing your time between the two of you? That's correct. Okay, and you will watch your time. All right. Please begin. I think the first counsel is Carson Reed? Carson Griffiths. Okay, Griffiths. Good morning, Your Honors. Counsel. May it please the Court. Assistant Attorney General Carson Griffiths on behalf of the people. In the midst of the mortgage foreclosure crisis, the General Assembly established two programs funded by a fee on residential mortgage foreclosure actions. The first, the Foreclosure Prevention Program, provides counseling to prospective homebuyers and homeowners on how to avoid foreclosure. And the second, the Abandoned Property Fund, provides grants to municipalities to maintain and secure properties left abandoned during the foreclosure process. The circuit court in this case struck down the fee and both of those programs, largely based on its conclusion that they were too attenuated from court operations and maintenance under this Court's decision in Crocker. But the circuit court overlooked the rational connection between those programs and the General Assembly's goal of reducing circuit court caseloads. This Court, therefore, should reverse the circuit court's March 2, 2020, order and remain with instructions to enter summary judgment for defendants. There are four constitutional issues in this case. I would like to address them in two groups of two, beginning with plaintiffs' free access and due process clause challenges, which are best addressed together because the free access clause qualifies the general due process standard by imposing the additional requirement that court filing fees be reasonably related to court operations or maintenance. And that connection exists here because, again, both programs were designed to reduce circuit court caseloads. The foreclosure prevention program was designed to help homeowners avoid foreclosure and fewer foreclosures means fewer foreclosure actions that circuit courts would have to preside over. And the Abandoned Property Fund, again, was designed to mitigate the negative effects of the blight caused by abandoned properties that were increasing during the foreclosure crisis, which lead to problems like crime, increased risk of accident, and even more foreclosures, all of which fuel additional litigation. And so by trying to remedy those negative effects, the General Assembly could have reasonably concluded that circuit courts would have diminished dockets. Again, the circuit court here relied on Crocker, but Crocker does not compel a contrary result. Crocker involved a fee on dissolution of marriage actions that was used to fund a program for domestic violence victims. And this Court really expressed two concerns with that system in Crocker, neither of which are present here. The first concern was that the only connection the Court could draw between the domestic violence shelters in Crocker and the court system was that the moral and emotional support provided by the shelters to victims of domestic violence might make them more efficient users of the judicial system if they became involved with the judicial system in some future litigation. But there's more direct connections here with the court system. Unlike the mere moral and emotional support provided by the shelters in Crocker, the foreclosure prevention program provides a type of legal education, in a sense. It informs homeowners about the foreclosure process, how to avoid it, and in that sense, it much more closely resembles the type of legal education that this Court held could be validly enacted through a filing fee in its decision in Ali. As for the abandoned property fund, that does not, like the domestic violence programs in Crocker, simply provide support for individuals' general well-being, which then might have some tangential benefit to the court system if they're involved with the court system down the line. Again, it was designed to reduce negative effects of property abandonment, all of which fuel litigation. And in that sense, they much more closely resemble the neutral site custody exchange centers that the appellate court upheld in Leip and Smith Silk, where the appellate court stressed that the General Assembly could have reasonably concluded that conflicts during child custody exchanges would fuel additional litigation and those neutral site exchange centers would reduce those conflicts. It's the same situation we have here, where reducing the social frictions caused by blight in abandoned properties would reduce the likelihood of future litigation. The other concern that this Court had in Crocker was that there was no connection between dissolution of marriage actions, which, again, were the type of actions on which that fee was imposed, and domestic violence. Unlike this case, though, there's a strong connection between mortgage foreclosures and the problems that the foreclosure prevention program and abandoned property fund were designed to address. So on both of those points, Crocker is distinguishable. It did not control the circuit court's conclusion here. For their part, plaintiffs stake much of their claim on the argument that some sort of some form of heightened scrutiny or even strict scrutiny is warranted here, but that's incorrect for three reasons. First, in interpreting the Free Access Clause, this Court has emphasized that a court filing fee need only be reasonable, and it has also deferred to the legislature's judgment as to whether a fee is desirable. Both of those standards very closely resemble the rational basis test. And, in fact, every appellate court decision to have considered the appropriate level of scrutiny to be applied to a court filing fee under the Free Access Clause has used the rational basis test. Second, the rational basis, this Court has used the rational basis test in analyzing the constitutionality of court filing fees under the Due Process Clause. And as noted, the Free Access Clause and Due Process Clause are very similar. One really just qualifies the other. And so because of the similarity of those analyses, this Court should apply consistent tests across both clauses. And third, generally speaking, the rational basis test is the default standard when reviewing the constitutionality of any statute that does not impact fundamental rights or a suspect class. And here we don't have either of those circumstances. There's no contention that plaintiffs are members of a suspect class. And although plaintiffs have argued that their fundamental right to access the court has been impacted by the fee, this Court has made clear several times that there is no constitutional right to fee-free litigation. And so for that reason, heightened scrutiny is not appropriate. Plaintiffs cite Crocker and Boynton for the proposition that heightened scrutiny is warranted, but Crocker makes no mention of heightened scrutiny and, in fact, stressed that there is no constitutional right to fee-free litigation. And also Boynton was not a Free Access Clause case. It was a due process challenge to a marriage license fee, not a court filing fee. And the important factor there was that this Court stressed that the fee on marriage licenses imposed an impediment on an individual's fundamental rights to marry. Again, we don't have a fundamental right at issue here because there's no fundamental right to fee-free litigation. So because rational basis is the appropriate test to apply as to the Free Access Clause and Due Process Clause, and there is a rational connection between the two programs funded by the foreclosure fee and court operations and maintenance, this Court should reverse the circuit court's order as to those two clauses. Turning to the uniformity and equal protection clauses, those issues are also best addressed together because if a statute satisfies the uniformity clause, it necessarily satisfies the more lenient equal protection clause. So under the uniformity clause, a tax classification will be upheld if it is based on a real and substantial difference between the parties taxed, those not taxed, and there is some rational relationship for the legislature or between the legislature's tax classification and public policy. Both of those elements are easily met here. There is a real and substantial difference between foreclosure plaintiffs and other plaintiffs. Foreclosure plaintiffs initiate litigation that causes abandoned properties and other societal problems that other plaintiffs' litigation does not. And it's reasonable for the legislature to decide that only foreclosure plaintiffs should bear a modest portion of the cost of those problems in making its tax classification. It's very similar to this Court's holding in Arangold, which involved a tax on tobacco distributors to pay for nursing facilities, or this Court's conclusion in Northern Illinois Homebuilders Association, which was a fee on new property developments that was not imposed on existing property developments. The circuit court, for its part, as to the uniformity and equal protection clauses, didn't offer much in the way of a meaningful analysis of that. It simply recited the elements of the uniformity test and said that the foreclosure fee did not meet that test. And plaintiffs, in their briefing, have focused on an irrelevant distinction in arguing that the uniformity clause is violated. Rather than focusing on the difference between the parties taxed, foreclosure plaintiffs, and the parties not taxed, other plaintiffs, they focus on how the funds that were collected from the filers were then ultimately used throughout the State, saying that too much money went to Chicago or Cook County. But again, the uniformity clause looks at the distinction between the parties taxed and not taxed, not how the funds collected are ultimately spent. And as this Court has made clear recently in Marx, under the uniformity clause, even if plaintiffs or their communities received no benefit whatsoever, which is not the case, they did receive funds, but even if they did not, that would have no bearing on whether the uniformity clause was violated. The counsel is the abandoned property fund used only on foreclosed properties? No. I don't believe it's used only on foreclosed properties. It can be used for abandoned residential property, which is defined in Illinois Housing and Development Authority's regulations. But I would note that plaintiffs have brought a facial challenge in this case, so the fact that it might be used on some property that wasn't in the foreclosure process isn't enough to sustain their burden here. They'd have to show that it was essentially never used for a property that was left abandoned during the foreclosure process. But it supports their argument that it's not used for court operational purposes? It is their argument that it's not used for court operational purposes, but, again, there is a rational connection between the goal of mitigating those negative effects of abandoned properties, which did increase during the foreclosure crisis. So there is a causal connection between foreclosure litigation and an increase in abandoned properties, and then trying to reduce that sort of feedback loop of foreclosures, abandoned properties, and then even more foreclosures that was seen earlier during the foreclosure crisis. So just turning back briefly to the uniformity clause, even if plaintiffs' geographic distinction, their argument about how the funds were spent was relevant, this court affords the legislature broad deference under the uniformity clause. And so plaintiffs' argument that essentially more money should have gone to different parts of the State would not be a question that this court would wade into under the uniformity clause. It would defer to the legislature's decision, which is reasonable, to apportion a significant amount of that funds to the most populous areas of the State. So unless this Court has any other questions, for those reasons and the reasons stated in our brief, we ask that you reverse the Circuit Court's March 2, 2020, order and run it now with instructions to enter summary judgment for defendants. Mr. Fangman? May it please the Court. My name is Paul Fangman. I'm an Assistant State's Attorney representing Iris Martinez, the Clerk of the Court of Circuit Court of Cook County. Let me begin by saying that we agree with and we join the Attorney General's arguments that the statutes are constitutional. We know that if a case can be decided on non-constitutional grounds, the Court should do so before considering constitutional issues. Here, this Court has an alternative. The Court does not have to reach those issues. In this case, the Voluntary Payment Doctrine bars the plaintiff's claims. The Voluntary Payment Doctrine holds that money that's voluntarily paid under a claim of right to that payment and with knowledge of the facts cannot be recovered on the grounds that the payment was illegal. Common law rights and remedies remain in full force in this State unless expressly appealed by the legislature or modified by the Court's decision. This doctrine is a common law rule of general application. There are exceptions to show that a payment was not paid voluntarily. For instance, duress, compulsion, fraud, or mistake of fact. Here, the Circuit Court incorrectly found that the duress exception applied and that the plaintiffs had shown that they were coerced into paying the filing fee. Each of the cases brought forth by the Circuit Court and the plaintiffs in this case involve fact-specific circumstances where the payee held actual or threatened power over the payor. They are clearly distinguishable from this case in that manner. The first case that's most important to discuss is Midwest Medical v. Brown. In that case, the First District Court found that duress did exist. And importantly, the First District Court said that the reason that they found duress is because the plaintiffs would have lost access to the courts. However, it wasn't just access to the courts that was at issue. It was access to the courts to challenge an order that was already entered against them. Plaintiffs had already filed a fee, filed a case. They'd already argued their case. They'd had an order entered against them, and they were seeking to vacate the order or move to reconsider the order. The court in Midwest enunciated the test for duress. The court said that it had some actual or threatened power wielded over the payor where some immediate relief was necessary. There are several other cases cited in our briefs where the courts talk about the duress test. Norton v. City of Chicago, Illinois Glass, and Ghetto v. City of Chicago. All of those cases are different from this case. In those cases, there was some coercion or threatened default judgment, for instance, in Norton, which would cause the businesses at hand to fail. And the courts in those cases found business coercion. Here, the situation is different. In those cases and in all of the cases under duress, you can see a figurative sword of Damocles hanging over the plaintiffs. Here it's different. Plaintiff Reuben Walker testified before the circuit court that if the clerk had told him that the fee wasn't required, he would have preferred not to pay it. He said that he was anxious to file his mortgage foreclosure. He knew that the fee was required. But he didn't take any steps to avoid paying the fee. He didn't seek a fee waiver. He didn't write under protest on his check. He just says that he would prefer not to have paid it. That's not enough for duress. The duress standard that's stated throughout the cases clearly establishes something more. You need something more along the lines of coercion. The court found his testimony credible, and it was, but it just wasn't enough. Finally, the most controlling case in this situation is McIntosh v. Walgreens. In that case, this court found that the legislature had not expressly limited the voluntary payment doctrine in the Consumer Fraud Act. And so if the legislature hadn't expressly limited it, the plaintiff had to prove some coercion, some involuntary payment. This court, again, enunciated the standard. Common law rights and remedies remain in full force in the state of Illinois. And unless there's some legislative limiting or unless the courts have made decisions, then the voluntary payment doctrine still applies. Because the voluntary payment doctrine bars plaintiff Walker's claims, it also bars the plaintiff Klass's claims. So, therefore, Clerk Martinez respectfully requests this court to reverse the circuit court's order and remand the case back to the circuit court for entry of summary judgment for defendants. Unless there's any questions, thank you very much for your consideration. Mr. Craig? Good morning, Your Honors. And may it please the Court, I am Daniel Craig. I represent the plaintiffs, Reuben Walker and Steven Dimond, and all of those individuals who paid mandatory mortgage foreclosure fees in Illinois, which included add-on fees to fund the Save Our Neighborhood programs from October 1, 2010 to the present. In my presentation, I will address first the issue of voluntary payments defense. I think it's important to note that this defense is maintained only by Iris Martinez, Circuit Court Clerk of Cook County. The people of the state of Illinois and the Circuit Court Clerk of Will By my argument today, I will provide the plaintiff's position that a voluntary payment defense makes little sense in the scenario of a mandatory court filing fee, where payment of a fee is required before the plaintiffs can attempt to protect their property rights in a mortgage foreclosure action. But I am not alone in this belief. The people of the state of Illinois also maintain that claiming a voluntary payment defense regarding mandatory filing fees makes little sense, as those fees are mandatory and must be paid for access to the courts. During oral argument in the trial court, the trial court specifically asked the defendants if they were maintaining the voluntary payments defense. The people of the state of Illinois denied they were maintaining the defense. Consistent with this position, the people of the state of Illinois did not assert a voluntary payments defense in their briefings to the court. That's why you see only Cook County coming up here and arguing that defense. A voluntary payments defense applies when money is paid voluntarily under a claim of right to payment with full knowledge of all facts and circumstances by the person making the payment. Under this defense, the payor cannot recover back the payment on the grounds that the claim was illegal. However, the voluntary payments defense is inapplicable where the person making the payment doesn't have full knowledge of the facts and circumstances and or where the payor is under duress or compulsion, meaning he or she did not pay voluntarily. Here, plaintiffs filed mortgage foreclosure actions after October 1 of 2010 that had add-on fees of $50, $250, or $500, depending upon how many mortgage foreclosure actions you filed that year. But unfortunately, the plaintiffs lacked full knowledge of the facts surrounding the impermissible fee. Clearly, plaintiffs understood that they have to pay a fee. We understand that. But the court fee they paid was a single scheduled fee and not itemized, which is much different than all of the cases which the Cook County refers to. Reuben Walker testified that he was charged a single filing fee amount of $476 to $50, and his receipt did not show any breakdown of those filing fees. It was a single flat fee. So when the action was filed, depending on the number of actions that are filed or the number of cases, that's when the person found out the cost of the filing fee? Well, basically, and this is part of the court record, the filing fee just says $476. It doesn't break it down that $50 was added to the Save the Neighborhood program. That's not related. It was in Will County, and it's Will County filing fee for such and such number of foreclosures, $476. The other ones had a different number on them. Yes. Just one total number, not a breakdown. The situation of a payment of a single mandatory filing fee for access to the court is factually different than the cases cited by Cook County where the voluntary payments were held to be a valid defense. In Friend v. Avis Rent-A-Car, the rental car customers were given specific itemizations of all of the taxes which they had to pay, and it was broken down. They were in possession of receipts which showed those charges and taxes, and so they were found to have made a voluntary payment. So, too, in the Leszczynski v. Dominick's Finer Food case, where a shopper who submitted nonreimbursable discount coupons and was taxed an Illinois use tax, the court found that the shopper made a voluntary payment because her receipt indicated the value of the item purchased, the value of the coupons redeemed, and, more importantly, the amount of the tax charge. Therefore, the plaintiff did not have a duress claim, nor did she have a claim of lack of duress. You mean by Reuben Walker when it was paid? No. I mean, he said in his testimony, I understood that there's a filing fee that's going to be required for the mortgage foreclosure. I went to the court. The court chose the mandatory filing fee, and I paid the mandatory filing fee because I was, the facts were not important to the Reuben Walker case, but his son-in-law was mortgaging and adding mortgages improperly to the property that he owned, Reuben Walker owned. So time was of the essence for him to get into court on his particular circumstance, as it is on most mortgage foreclosures. You don't want that particular property not to have someone in it and someone who didn't hire somebody to go down and say, hey, what makes up that $476? Is there a $50 fee? And let me put in $5,000 worth of legal work figuring out if that $50 fee is valid or not. He knew it was a mandatory filing fee, and he paid the mandatory filing fee. And here, unlike the friend in Lusinski, Walker's direct testimony evidenced a complete lack of knowledge as to the fee. The knowledge has to be there at the time of payment of the fee. If you come into knowledge after that, that doesn't count as to a voluntary defense, voluntary payment defense. And pursuant to the requirements of the voluntary payment defense, plaintiffs must have knowledge at the time, again, in order to protest. Because plaintiffs who pay mandatory filing fees do not have this information, they cannot have made a voluntary payment as a matter of law. But even if the court finds that the plaintiffs somehow have sufficient information, which would deny them a lack of full knowledge exception to the voluntary payments defense, the mandatory nature of the filing fee necessary to access the courts to protect their property rights places the plaintiffs under compulsion and or duress. Duress is defined under the voluntary defense case law as occurring when the taxpayers really do not have the choice. Here, the plaintiffs had no option but to pay the court fee to protect their property rights. Plaintiffs could not access the court or protect their rights without first making that required payment. The Midwest case is instructive, the Midwest medical records case. There, the Midwest medical plaintiff challenged the Clerk of Courts Act, a $60 fee, which was required to be paid to reconsider interlocutory orders. And a failure to pay that court fee would have prevented the plaintiff from the ability to challenge interlocutory orders. I don't see a real difference between stopping someone from even filing a case, rather than a situation where someone is inside a case and now wants to further challenge an interlocutory fee. This one is, the filing fee situation, it leads to the same result. You don't have a cause of action. You have to pay these fees. And so there's really no distinction between the Midwest case and our case. Clearly, the rights to protect property through access to the courts is a fundamental Article 1 constitutional right provided to all people of the state of Illinois. There's no reasonable alternative other than to pay the mandatory fee in order to gain access. I think Cook County unpersuasively argued that the Midwest case is a constitutional right. They argue that access to the court is not a constitutionally protected right in mortgage foreclosure cases. Further, they argue that Reuben Walker should have performed a useless action of saying to the court, I'm not an indigent, but I want the indigent's waiver of the filing fee. A similar waiver-type argument was attempted in the case of Geary v. Dominick in which the plaintiff did not have to attempt to buy the certain feminine hygiene product, a tampon, without paying the tax in order to prove involuntary payment. This court noted that to do so was useless as no store would waive a tax. They must tax the goods. Here, no court would waive the mandatory filing fee for indigent litigants. Notwithstanding Cook County's position on the matter, the court's argument to the contrary, the law does not require plaintiffs to perform useless acts to prove involuntary payment. Again, the ruling of the Geary v. Dominick's finer food case. Finally, there is no reasonable alternative for Reuben Walker and all plaintiffs other than to pay the mortgage fee to allow access to the courts. Plaintiffs cannot recover or protect their property without access. The duress necessary to establish payments under compulsion has been expanded in recent years. Some examples of the expanded definition of duress and compulsion, rain tree homes where a developer was paying a impact fee to a village, had paid it for quite a while and even knew the fee and knew that, in fact, that fee was being placed upon it. Finally, the developer decided that it was going to be necessary to challenge the fee. The village said, well, you've been paying this for years. You don't have an ability to challenge this. It was a voluntary payment. You paid it with knowledge of the fee. And the court said that absolutely not. It's a business compulsion. This particular business needed to make the improvements to those properties. They needed to pay the impact fees to stay in business. There was a business compulsion. That was duress. Voluntary payments defense does not apply. So, too, in the ghetto versus city of Chicago case, a claim of voluntary payments defense was made. The court said no. This had to deal with telephone charges. The telephone is a necessity for businesses. Therefore, there was a compulsion for business to pay voluntary payments. So, too, in the Gary versus Dominic's Finer Foods, again, the female hygiene product case, the court said that is a necessity for women. We are not going to require them to pay under protest that particular tax. We are going to require them to pay under protest on that particular product. So, if the business compulsions or necessities cited in those cases can defeat voluntary payments defense, then the constitutionally protected fundamental access to the courts, which is without question a necessity, clearly defeats the voluntary payments doctrine. I will now move on to the plaintiff's free access clause challenge to the subject add-on fees. The plaintiff's free access clause challenge. You know, defendants here asked this court to find constitutional the challenge fee statute that taxes mortgage foreclosure litigants only to fund general welfare program called Save Our Neighborhoods program. These general welfare programs include housing, counseling, and cleanup and repair of maintenance of privately owned residential properties. The defendants claim these statutes are constitutional because there's a conceivable relationship, not a rational and not a direct relationship, between the challenge court fee and court operations or maintenance. This court has squarely rejected this argument in Crocker v. Finley. In Crocker v. Finley, this court struck down as unconstitutional a $5 filing fee charged in dissolution of marriage cases to fund domestic violence programs. This court reasoned that dissolution of marriage petitioners should not be required to pay mandatory fees to fund general welfare programs that neither directly relate to their litigation nor to the operation of the court system. That's an important test that this court put in, that they neither directly related to their litigation nor directly related to the operation of the court system. In Crocker, the defendants argued that the private counseling received from domestic violence programs would allow potential litigants to use the court system more efficiently, in much the same way that a county law library improved the administration of justice. But this court was not persuaded and found that the asserted relationship between the fee and the court system was not a rational and not a reasonable one. Although conceivable, it was simply too remote to save the tax from a constitutional shortcoming. Well, the Attorney General says, unlike Crocker here, this directly assists in providing counseling to assist homeowners in avoiding foreclosure. Yeah. Well, again, it's a community-based program, not in the courts. It's not helping the litigants. And in that particular program, you don't even have to be in litigation. You don't have to have any court tie. And the courts here are not in control of that. As Your Honor may remember, in Rule 99.1, this court put into established ways that litigants in the court system can be helped with court mediations and counseling. This other counseling is complete and separate from the court system. In fact, as we will see in a minute, and when I continue on, is that this counseling is not legally related. It excludes legal relationships, legal relation counseling. So you can't have someone in pro bono. It's not setting up a pro bono counseling system. It's not setting up any type of counseling system where legal services are provided. So what you're doing is you're setting up community counseling centers where anybody can go to them. They don't have to be related to the court. Anyone can go to them. It's a nice idea, but it's not related to the court system. And that's what Crocker said. It's got to be related to the court system. This court has to be able to oversee that particular program. And I think that's the key difference, is that they're not related strictly to the court system. And, of course, there are other issues where a narrow group of litigants are paying for all of these community developments to exterminate rats, to paint fences. Sotomayor Can I go back to what you just said? You're saying it's required that whatever the funds generated from some kind of filing fee to be constitutional, that this court must have some oversight of those funds? Is that what you're saying? Well, what I'm saying is that in order, what Crocker said was that it had to be related to the courts. And in that respect, the courts have to have some control over these funds. The court can't just say, listen, we're going to tax all of our litigants and we're just going to give it to social programs without us having to worry about what happens and where it goes. That's improper. I think Crocker is making that distinction. Crocker says it has to be related to court operations. And the cases that have found that it was constitutional and not a free access clause violation, all had court oversight, some court oversight. And they were more directly related. In Crocker, you could have made an easy argument that with the dissolution of marriage, there's a lot of people who are divorced because of domestic abuse. So there is, in fact, a relationship there. You can make that relationship. And in having domestic abuse shelters, it will cut down on crime. As counsel said about what mortgage foreclosures do, they cut down on crime. And if we can stop mortgage foreclosures from happening, you can say that about any program. Again, you set up a domestic abuse shelter for women or others, that particular shelter will cut down on crime. And that helps unburden the criminal courts. So it's just too remote. And that's really the test of Crocker. It's too remote. Thank you. Mr. Griffiths. Thank you, Madam Chief Justice. Just a few quick points. Counsel referred several times to general welfare programs and said that they have to directly relate to the litigation on which a filing fee is imposed. He added the word directly there. What Crocker states is that a certain class of plaintiffs should not have to pay for general welfare programs that relate neither to their litigation or the court system. Again, here we have programs that relate directly to foreclosure litigation and the problems that it causes and also the court system by trying to reduce circuit court caseloads. Counsel also mentioned that the fact that this court or the judicial system isn't involved in administering the funds, that's not relevant for purposes of the Free Access Clause. In Ali, this court upheld a fee that was used for county law libraries, and in Cook County, those county law libraries were administered by the county board and, more specifically, a library commission appointed by the county board. There was no real oversight by the judicial system there. Similarly, the appellate court in Leip, Smith, Silk, and Wenger all upheld programs that were run by nonprofit organizations, similar to the foreclosure prevention program here, where funds are essentially grants to nonprofits to provide community organizations. And I'd also note that even in Crocker, the domestic violence programs in that case were administered by the Department of Public Aid. And in striking down the fee there, this court didn't really express any concern about the executive branch's involvement with that program. So there's no real issue with the fact that the foreclosure prevention program and the abandoned property fund weren't administered or supervised by the judicial system. Sotomayor, should our focus be on whether the funds or the preventive action is closely enough attenuated to maintenance and operation of the courts in order to pass muster? Yes, that's the focus under Crocker. But I think also in a case like this where there's a fee imposed on a certain class of litigants, the concern in Crocker that there must be a relationship between those types of cases on which a fee is imposed and the problems that the program were designed to address also comes into play, which we have here where, again, foreclosure actions cause certain societal problems, and the problems that the legislature tried to address are paid for, or the programs designed to address those problems are paid for. But not everything that addresses social ills would be justification for a fee, would they? No, not everything, Your Honor. I think Crocker is an example of one. Another potentially could be plaintiffs note in their brief a filing fee used to pay for road construction or bridge construction. That would likely be too attenuated. I mean, the specifics would matter, but it would likely be too attenuated. Here, again, we have problems created by the mortgage foreclosure crisis that were flooding the circuit courts with foreclosure cases, and were also creating other types of litigation like criminal prosecutions, increased likelihood of tort actions. And so it's reasonable for the legislature to decide that foreclosure plaintiffs should bear some modest portion of the cost of dealing with those. Finally, the counsel pointed out that in Crocker there was maybe a connection between dissolution of marriage and domestic violence, but there was no connection in the sense that dissolution of marriage actions did not cause domestic violence. Individuals filing for divorce don't then lead to domestic violence necessarily. That's not an apparent connection. But here we have strong causal connections between foreclosure litigation and more foreclosure actions, which we saw during the foreclosure crisis. And so, again, for those, unless this Court has any questions, excuse me, for those reasons, we ask that you reverse the circuit court's order. Thank you. Mr. Fangman? Good morning, Your Honors. Just first to address counsel's statement about the Attorney General's statement in court, in the circuit court. Absolutely, the Assistant Attorney General did say, upon questioning by Judge Anderson, that the court filing fees are mandatory and obligatory to get access to court. That's not challenged. That is true. However, a mandatory fee is not per se duress. There are a variety of cases in which courts find that. Smith v. Prime Cable is a situation where there's a contractual fee, and the court found that the nature of the fee being mandatory does not per se make it duress. Fisher v. City of Ottawa, likewise, the enforcement provisions in that ordinance did not make the payment involuntary per se. Going way back to 1923, this court enunciated a specific standard for duress that said, in the Chicago and Eastern Illinois v. Miller case, where money is paid under severe statutory penalties for a disastrous effect to business, that's duress. So I think it's important to distinguish the facts of this case to those cases. Also, with regard to counsel's statement about the Attorney General, the Will County Clerk of Court did join in the voluntary payment doctrine in the trial court. They expressed support for that doctrine upon questioning by Judge Anderson. They did not join our brief, and they did not file a brief on it here, but they did express support for it in court. With regard to the mandatory issue, I think that's one that's very explicit. When you look at, there's a tax provision that the legislature has amended, 35 ILCS 200-23-5. The legislature limited the voluntary payment doctrine in that case for real estate taxes, and they said that any taxes that were paid were deemed paid under protest. So the legislature does have the ability to limit the voluntary payment doctrine, and here they did not do that. Every day in Cook County and in counties all over the state, fee waivers are issued. Every day in the county, people file mandatory fees, and they protest them. They file them under protest. Fee waivers is another example. The legislature altering the doctrine also is an example. So those are things that I think that are different from this case. Were the fees assessed in the lump sum? Counsel did say that the fee is $476 in this case, and I believe that is in the record. So how would you know you had something you wanted to protest? It's not in the record, because this case is a Will County Circuit Court case. In Cook County, the fees, traditionally you do get a receipt, and it lists out the nature of the fees. With electronic filing these days, I don't believe that it's broken out anymore. But if you're standing at the register in Cook County, you do get a receipt that lists out the different fees. Finally, with regard to lack of knowledge, I know counsel addressed that. Did his client have an opportunity to inquire about the charges? Yes, his attorney is the party that paid the fee and filed the case. And he hired an attorney for the purpose of filing his case.  He could have sought a fee waiver. The courtroom doors were not barred to him. He had access to the courts. And this case, again, is different than the Midwest medical case. In that case, there was a sort of Damocles. There was an actual order that was already entered, and the plaintiffs were put in a precarious position. Here, the facts are different. They're just not enough to show coercion. Unless the Court has any other questions, I would just ask that you remand the case for dismissal. Thank you. Thank you, Your Honor. Case number 12606, 087, and 088, Ruben Walker v. Andrea Van Chasteen and Kwame Raul. This case will be taken under advisement as agenda number 12. Thank you, Mr. Griffiths, Mr. Fangman, and Mr. Cray for your arguments this morning.